**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-00445-GPG-RTG

GLENWOOD SPRINGS CITIZENS' ALLIANCE,

      Plaintiff,

v.

U.S. DEPARTMENT OF THE INTERIOR, and
U.S. BUREAU OF LAND MANAGEMENT,

      Defendants.

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

      Defendants, the United States Department of the Interior ("DOI") and Bureau of Land Management ("BLM"), move for summary judgment on Plaintiff's claims, all of which are brought under the Freedom of Information Act ("FOIA"). Defendants are entitled to summary judgment because (1) the BLM conducted a reasonable search for documents responsive to Plaintiff's FOIA requests, and (2) the BLM properly applied FOIA exemptions 3, 4, 5, and 6, releasing all reasonably segregable nonexempt material.

      This case concerns three FOIA requests that Plaintiff Glenwood Springs Citizens' Alliance ("GSCA") submitted to Defendants seeking records spanning 40 years related to (among other things) mining operations on BLM-administered land, and a proposed expansion of the Mid-Continent Mine outside Glenwood Springs, Colorado ("the Mine").

      In response to Plaintiff's three requests, the BLM conducted searches that were carefully and appropriately designed to locate responsive records. Thirty-three BLM

employees were identified as potential custodians and conducted searches of all sources reasonably likely to contain responsive information. As a result of these searches, the BLM identified a large volume of potentially responsive documents, which it then made extensive efforts to review, line-by-line, to determine the applicability of FOIA exemptions and to identify reasonably segregable, non-exempt material to be released to Plaintiff. Each invocation of an exemption was approved by an attorney in the Office of the Solicitor. In anticipation of this motion, each FOIA exemption was re-reviewed and approved by attorneys in the Office of the Solicitor and the Department of Justice ("DOJ"). Ultimately, the BLM produced in full over 20,000 pages of documents to Plaintiff.

In this case, Plaintiff asserts four claims alleging that Defendants failed to justify their use of FOIA exemptions (Claims One and Two), to conduct an adequate search (Claim Three), and to provide all reasonably segregable portions of withheld documents (Claim Four). *See* ECF No. 13 ¶¶ 159-173.

As detailed below and in the declarations and *Vaughn* Index accompanying this motion, the BLM's search for responsive documents was reasonable and withholdings of exempt material were justified in accordance with the applicable law. Accordingly, Defendants respectfully request that the Court enter judgment in their favor.

## MOVANT'S STATEMENT OF MATERIAL UNDISPUTED FACTS

### I.    <u>Background of the Mine</u>

1.    The Mine began operating in 1982, providing crushed limestone to a nearby mining complex. Movant's Appx., p. 5 (Garcia-Hinojosa Decl. ¶ 9).

2.      In 2016, Rocky Mountain Industrials, Inc. ("RMI," formerly Rocky Mountain Resources or RMR)—a for-profit corporation—purchased the Mine and began operates it pursuant to BLM permits. Id. at 6 (Garcia-Hinojosa Decl. ¶¶ 9-10).

3.      Beginning in November 2018, RMI began submitting proposals to modify operations at the Mine to expand the current site footprint, which have been, or currently are, under review by the BLM. Id. (Garcia-Hinojosa Decl. ¶ 11).

4.      The BLM's evaluation of RMI's proposed expansion included, among other things, a Determination of Common Variety ("DCV") and various studies, including hydrologic, cave/krast, ethnographic. Id. (Garcia-Hinojosa Decl. ¶ 12).

5.      In addition, RMI has established an escrow account into which it pays amounts based on its revenues that will cover the potential royalties owed to the BLM depending on the DCV. Id. at 7 (Garcia-Hinojosa Decl. ¶ 13).

6.      As the escrow payments correspond to RMI's revenues, RMI submits to the BLM sales data to substantiate those payments. Id. (Garcia-Hinojosa Decl. ¶ 16).

**II.    Procedural History of Plaintiff's FOIA Requests**

7.      On June 12, 2018, Plaintiff submitted a FOIA request to the BLM's Colorado State Office seeking "[a]ll records involve the [Mine] . . . (starting in 1982) to the present day" (the "2018 Request"). Movant's Appx., p. 50-51 (Garcia-Hinojosa Decl., Att. A).

8.      In six installments, the BLM produced 7,500 pages of responsive records, 149 pages with redactions, and withheld 263 pages subject to exemptions set forth in the *Vaughn* Index. *Id.* at 8, 64-116 (Garcia-Hinojosa Decl. ¶ 20, Att. C "*Vaughn* Index").

9.      On November 8, 2019, GSCA submitted a second FOIA request to the

BLM's Colorado State Office seeking "the same records as described" in the 2018 Request "from the initial June 12, 2018 FOIA request date until the present day" (the "2019 Request"). *Id.* at 139-140 (Garcia-Hinojosa Decl., Att. E)

10.    Over four installments, the BLM produced over 9,000 pages in full, 1,080 pages with redactions, and withheld 232 pages subject to exemptions set forth in the *Vaughn* Index. *Id.* at 8-9, 64-116 (Garcia-Hinojosa Decl. ¶ 23, *Vaughn* Index).

11.    On November 2, 2022, GSCA submitted a third FOIA request to the BLM's Colorado State Office seeking the same information as the 2018 and 2019 FOIA Requests from "November 8, 2019 . . . until the present day" (the "2022 Request," collectively "the Requests"). *Id.* at 166-168 (Garcia-Hinojosa Decl., Att. H).

12.    Over three installments, the BLM produced over 3,300 pages in full, 718 pages with redactions, and withheld 357 pages subject to exemptions set forth in the *Vaughn* Index. *Id.* at 9, 64-116 (Garcia-Hinojosa Decl. ¶ 26, *Vaughn* Index).

13.    Plaintiff filed formal appeals to DOI's FOIA office for all three Requests. *Id.* at 26 (Garcia-Hinojosa Decl. ¶ 61); ECF No. 13 ¶ 9.

### III.    The BLM's Search for Potentially Responsive Documents

14.    The BLM used the date ranges Plaintiff provided in its Requests to search for responsive documents. Movant's Appx., p. 13, 50-51, 140, 168 (Garcia-Hinojosa Decl. ¶ 40, Atts. A, E, H).

15.    In total, across all three Requests, the BLM identified thirty-three individuals as likely to have responsive records (the "custodians"), and the records of those custodians were searched. *Id.* at 14 (Garcia-Hinojosa Decl. ¶ 42).

16.    The BLM provided the custodians a copy of the Requests and instructed them to search all of their electronic and paper files. *Id.* (Garcia-Hinojosa Decl. ¶ 41).

17.    Most of the custodians searched their own documents, using the search parameters they identified as most likely to identify potentially responsive documents, as the custodians themselves were best-positioned to know (i) where they would have saved potentially responsive documents in their files, and (ii) what search parameters would be best aimed to locate those documents. *Id.* at 16 (Garcia-Hinojosa Decl. ¶ 44).

18.    The custodians' search(es)[1] encompassed the following search terms and date parameters:

    a.    **Chad Mickschl\***: <u>Search terms</u>: RMR, Bobby Wagner, Mid Continent, Rocky Mountain Resources; <u>Dates</u>: 1982 to November 12, 2019. *Id.* at 16 (Garcia-Hinojosa Decl. ¶ 45).

    b.    **Lisa Dawson\*\***: <u>Search terms</u>: RMR, Mid-Continent, Quarry, Rocky Mountain Resources, Mid Continent, Bernhardt. Quarry, RMI, DCV; <u>Dates</u>: 1982 to November 3, 2022. *Id.*

    c.    **Kim Leitzinger\***: <u>Search term</u>: RMR; <u>Dates</u>: 1982 to November 12, 2019. *Id.*

    d.    **Jessica Lopez\***: <u>Search terms</u>: RMR, Cal-X, Mid-Continent Resources, Pitkin, Iron, Mid-Continent Quarry, Mid-Continent Resources, Mid-Continent Quarry; <u>Dates</u>: 1982 to November 12, 2019. *Id.* at 17.

---

[1] Custodians with a single asterisk conducted two searches, with two asterisks conducted three searches, and without an asterisk conducted one search.

e. **Hilary Boyd\*\***: <u>Search terms</u>: Amy Way, Bobby Wagner, Aleta Powers, Dan Neubaum, Mexican Spotted Owls, RMR, quarry, limestone, mine expansion, Mid-Continent, MSO, spotted owl, Oreohelix, RMI, Quarry, Limestone, Witch, Snail; <u>Dates</u>: 1982 to November 3, 2022. *Id.*

f. **Suzanne Mehlhoff**: <u>Search terms</u>: RMR, Mid-Continent, Quarry; <u>Dates</u>: 1982 to June 18, 2018. *Id.*

g. **Carla DeYoung\***: <u>Search terms</u>: RMR, CalX, Bobby Wagner, Jessica Lopez Pearce, Mid-Continent; <u>Dates</u>: 1982 to November 12, 2019. *Id.*

h. **Erin Leifeld\*\***: <u>Search terms</u>: RMR, ERO, Kathy Croll, Sean Larmore, Mid-Continent, Bobby, Bobby Wagner, S#795, 5GF876, RMI, Mid-Continent, Mid-Continent Quarry, Limestone; <u>Dates</u>: 1982 to November 3, 2022. *Id.* at 17-18.

i. **Miles Gurtler\***: <u>Search terms</u>: RMR, Mid-Continent; <u>Dates</u>: 1982 to November 12, 2019. *Id.* at 18.

j. **Nicolas Sandoval\*\***: <u>Search terms</u>: Limestone, RMR, Mid-Continent, Rocky Mountain Resources, Bernhardt, Brownstein, RMI, Glenwood Springs, Mid-Continent Quarry, Common Variety; <u>Dates</u>: 1982 to November 3, 2022. *Id.*

k. **Steve Ficklin**: <u>Search terms</u>: RMR, Mid-Continent; <u>Dates</u>: 1982 to November 12, 2019. *Id.*

l. **Helen Mary Johnson**: <u>Search terms</u>: RMR, Rocky Mountain Resources, Mid-Continent Quarry; <u>Dates</u>: June 12, 2018 to November 12, 2019. *Id.*

m. **Andrew Archuleta:** <u>Search terms</u>: RMR, Rocky Mountain Resources, Bernhardt, Brownstein, Mid-Continent Quarry; <u>Dates</u>: June 12, 2018 to November 12, 2019. *Id.* at 19.

n. **Larry Sandoval\***: <u>Search terms</u>: RMR, Cal-X, Mid-Continent Resources, Pitkin, Iron, Mid-Continent Quarry, RMI, Limestone; <u>Dates</u>: June 12, 2018 to November 3, 2022. *Id.*

o. **Kristy Wallner**: <u>Search terms</u>: RMR, CalX, Mid-Continent Quarry; <u>Dates</u>: June 12, 2018 to November 12, 2019. *Id.*

p. **Jill Bogdanovich**: <u>Search term</u>: RMR; <u>Dates</u>: June 12, 2018 to a November 12, 2019. *Id.*

q. **Doug Siple**: <u>Search terms</u>: RMR, Rocky Mountain Resources, Mid-Continent Quarry; <u>Dates</u>: June 12, 2018 to November 12, 2019. *Id.*

r. **Erin Jones**: <u>Search terms</u>: RMR, MOU, RMR NEPA, EIS; <u>Dates</u>: June 12, 2018 to November 12, 2019. *Id.* at 20.

s. **David Boyd**: <u>Search terms</u>: Secretary, Bernhardt, RMR, Rocky Mountain Resources, Mid-Continent Quarry; <u>Dates</u>: June 12, 2018 to November 12, 2019. *Id.*

t. **Brian Hopkins\***: <u>Search term</u>: Rocky Mountain Resources; <u>Dates</u>: June 12, 2018 up to and including November 12, 2019. *Id.*

u. **Brian Achziger:** <u>Search terms</u>: RMR, Rocky Mountain Resources, Mid-Continent Quarry; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

v.  **Stephanie Connolly**: <u>Search terms</u>: RMR, RMI, Mid-Cont Quarry, Cal X, MCR; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

w.  **Greg Larson**: <u>Search terms</u>: RMI, RMR, Quarry, Limestone, compliance; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

x.  **David Lazorchak**: <u>Search terms</u>: RMI, Mid-Continent, Quarry, Limestone; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.* at 21.

y.  **Brittany Cocina**: <u>Search terms</u>: RMI, MidContinent, Mid-Continent Quarry, MCQ, RMR; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

z.  **Sharon Sales**: <u>Search terms</u>:  RMI, Mid Continent Quarry, RMR; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

aa. **Monte Senor**: <u>Search terms</u>: RMI, Mid-Continent, Quarry, Limestone; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

bb. **Steve Hall**: <u>Search term</u>: RMI; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

cc. **Kirby Shedlowski**: <u>Search terms</u>: quarry, glenwood, mid-continent, RMR, Rocky Mountain Resources; <u>Dates</u>: November 8, 2019 to November 3, 2022. *Id.*

dd. The BLM does not have a contemporaneous record of the dates and search terms AJ Johnson used, but agency records indicate her search identified 90 pages responsive to the 2019 Request. *Id.* at 22.

ee. The BLM does not have a contemporaneous record of the dates and search terms Tom Fresques used, but agency records indicate his search identified

120 pages responsive to the 2019 Request. *Id.*

ff. The BLM does not have a contemporaneous record of the dates and search terms Gloria Tibbetts used, but agency records indicate her search identified 1572 pages responsive to the 2019 Request. *Id.*

gg. The BLM does not have a contemporaneous record of the dates and search terms Ben Smith used, but agency records indicate his search identified 10 pages responsive to the 2019 Request. *Id.*

19.     Locations searched in connection with the Requests included physical hard copy files, external and internal computer hard drives, custodians' email communications and attachments, BLM's local servers at the Colorado River Valley Field Office, and BLM Colorado State Office shared drive. *Id.* at 22 (Garcia-Hinojosa Decl. ¶ 46).

20.     For most custodians, two or three separate rounds of searches were conducted. *Id.* at 16 (Garcia-Hinojosa Decl. ¶ 45, n.2).

21.     Upon initial review of the documents received from the custodians, it was determined that no other custodians should be searched, as their records were not reasonably likely to contain unique documents not already captured by the searches the already-identified custodians had performed. *Id.* at 23 (Garcia-Hinojosa Decl. ¶ 50).

22.     In consultation with the Mine subject matter experts, the FOIA Officer, Laura Garcia-Hinojosa, determined that the Colorado River Valley Field Office—which covers the location of the Mine—and the Colorado State Office would possess documents or communications responsive to the Requests. *Id.* at 22-23 (Garcia-Hinojosa Decl. ¶ 47).

23.    Any communications with other offices, including Washington D.C., would have been between that office and the Colorado State Office, and would have been captured by the searches conducted by the Colorado-based custodians. *Id.* at 23.

**IV.    The BLM's Review and Productions of Responsive Documents**

24.    Once custodians had identified potentially responsive records, Ms. Garcia-Hinojosa reviewed the documents. *Id.* at 24 (Garcia-Hinojosa Decl. ¶ 53).

25.    First, Ms. Garcia-Hinojosa reviewed the potentially responsive documents to eliminate those not responsive to the Requests. *Id.* (Garcia-Hinojosa Decl. ¶ 54).

26.    Next, Ms. Garcia-Hinojosa determined which documents were not subject to any applicable exemption and should be released in full. *Id.*

27.    Finally, Ms. Garcia-Hinojosa reviewed the documents for the applicability of any FOIA exemptions, and applied redactions to all or parts of the pages of each document as appropriate. *Id.* (Garcia-Hinojosa Decl. ¶ 55).

28.    In general, the applied redactions included text indicating the exemption being asserted. *Id.* at 25 (Garcia-Hinojosa Decl. ¶ 56).

29.    Between November 2018 and September 2023, the BLM made thirteen productions to Plaintiff in response to the Requests. *Id.* at 26 (Garcia-Hinojosa Decl. ¶ 60).

30.    During the pendency of this case, Defendants provided two additional discretionary releases of documents to Plaintiffs. *Id.* at 26 (Garcia-Hinojosa Decl. ¶ 64).

31.    During this case, attorneys in the DOI and the DOJ reviewed each exemption assertion. *Id.* at 27 (Garcia-Hinojosa Decl. ¶ 65). While the vast majority of the initial exemptions were justified, in several instances the BLM agreed to limit or fully

remove previous exemption applications to limit the issues and documents at issue in this motion. *Id.* (Garcia-Hinojosa Decl. ¶ 66).

32.     These releases included letters between the BLM and RMI related to the Requests (described in more detail *infra* at 13-18) and a re-production of the documents attached to those letters. *Id.* at 192, 194-195 (Garcia-Hinojosa Decl., Atts. K & L).

33.     On September 27, 2024, the BLM re-produced to Plaintiff all the documents that it had previously produced in response to the Requests. *Id.* at 197 (Garcia-Hinojosa Decl., Att. M). The re-production included Bates stamps because the prior responses did not include them. *Id.* And that production included documents for which it had been determined that the redactions applied when the documents were initially produced should be reduced or removed. *Id.* at 198-201. In that production, the BLM released in whole or in part over 750 additional pages that had been previously withheld. *See id.*

34.     In total, the BLM has produced 2,800 documents and 20,764 pages in full to Plaintiff in response to the Requests. *Id.* at 27 (Garcia-Hinojosa Decl. ¶ 68).

**V.    Applicable FOIA Exemptions**

35.     In the course of its review of documents potentially responsive to the Requests, the BLM determined that certain information should be withheld under FOIA exemptions 3, 4, 5, and 6. Movant's Appx., p. 28 (Garcia-Hinojosa Decl. ¶ 70).

36.     The documents responsive to the Requests were reviewed both in the BLM's initial evaluation of the Requests and again during the pendency of this case to ensure that all reasonably segregable information not subject to a FOIA exemption has been released. *Id.* at 28, 46 (Garcia-Hinojosa Decl. ¶¶ 69, 123).

37.     A description of all of the material withheld in whole or in part pursuant to FOIA exemptions, and the bases for asserting those exemptions, are set forth in the *Vaughn* Index attached hereto as Garcia-Hinojosa Decl., Attachment C. *Id.* at 64-116.

**Exemption 3**

38.     Exemption 3 was applied pursuant to two statutory provisions: (1) the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. § 470hh(a), and (2) the Procurement Integrity Act, 41 U.S.C. § 2101. *Id.* at 30 (Garcia-Hinojosa Decl. ¶ 75)

39.     Exemption 3 was invoked pursuant to ARPA to protect the location of archeological resources for which removal requires a permit, by redacting maps or text that provided information about their locations. *Id.* at 30-31(Garcia-Hinojosa Decl. ¶ 77).

40.     Publicizing information about those locations would create a risk of harm to those sites because it would increase the opportunity for the unauthorized excavation and removal of the protected resources. *Id.*

41.     Exemption 3 was also invoked pursuant to the Procurement Integrity Act to protect disclosure of pre-award bids, proposal information, and source selection information. *Id.* at 31 (Garcia-Hinojosa Decl. ¶ 79).

42.     Providing that pre-award bid information would create a risk of harm to the government's procurement process. *Id.*

**Exemption 4**

43.     In its responses to the Requests, the BLM withheld RMI's and Pitkin Iron's confidential commercial information. *Id.* at 32 (Garcia-Hinojosa Decl. ¶ 82).

44.     As described below, during its evaluations of the Requests, the BLM sought

to consult with RMI when it appeared that the BLM was preparing to release information that RMI may consider confidential. *Id.* (Garcia-Hinojosa Decl. ¶ 81).

2018 Request

45.    On August 13, 2019, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2018 Request, but that RMI may consider confidential, and requested that if RMI "wish[es] to object to the release of this information," it should "provide a written statement setting forth the specific and detailed justification for withholding any portion." *Id.* at 203-206 (Garcia-Hinojosa Decl., Att. N).

46.    On August 29, 2019, RMI responded via email stating "[w]e did not see anything contained [in the provided documents] that we would classify as trade secret or as confidential." *Id.* at 206 (Garcia-Hinojosa Decl., Att. O), 251 (Wagner Decl. ¶ 14).

47.    On January 31, 2020, the BLM sent a second letter to RMI related to the 2018 Request, providing additional documents for review and requesting that if RMI "wish[es] to object to the release of this information," it should provide a statement justifying withholding any portion. *Id.* at 211-214 (Garcia-Hinojosa Decl., Att. P).

48.    RMI never responded to the BLM's second letter. *Id.* at 32-33 (Garcia-Hinojosa Decl. ¶ 85), 252 (Wagner Decl. ¶ 16).

49.    In response to the 2018 Request, the BLM withheld information under exemption 4 from a small number of documents that contained Pitkin Iron Corporation's (RMI's predecessor) bank account information. *Id.* at 33 (Garcia-Hinojosa Decl. ¶ 86).

50.    The BLM withheld this financial information because it understood Pitkin kept its bank account number confidential, provided it to the BLM with an implied

assurance of confidentiality, and Pitkin could be harmed if the public had access to its banking account and could interfere with its finances. *Id.*

2019 Request

51.    On February 13, 2020, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested that if RMI "wish[es] to object to the release of this information," it should "provide a written statement setting forth the specific and detailed justification for withholding any portion." *Id.* at 216-219 (Garcia-Hinojosa Decl., Att. Q).

52.    On March 13, 2020, the BLM sent a second letter to RMI providing additional documents the BLM had identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested again that if RMI "wish[es] to object to the release of this information," it should provide "a written statement explaining the justification for withholding any portion." *Id.* at 221-224 (Garcia-Hinojosa Decl., Att. R).

53.    On September 15, 2020, Ms. Garcia-Hinojosa emailed Robert Wagner from RMI regarding the BLM's March 2020 letter, writing "I believe you left me a voicemail in March stating that you did not see anything contained within the documents that would classify as a trade secret or as confidential. I am just verifying that this is correct." *Id.* at 227 (Garcia-Hinojosa Decl., Att. S), 252-253 (Wagner Decl. ¶¶ 19-21).

54.    Mr. Wagner responded that he "did not see anything contained within the documents that would classify as a trade secret or as confidential in that request." *Id.*

55.    On December 30, 2020, the BLM sent RMI a third letter attaching documents the BLM identified as responsive to the 2019 Request, but that RMI may

consider confidential, and requested that if RMI objects to the release, it should provide a statement justifying the withholding. *Id.* at 229-232 (Garcia-Hinojosa Decl., Att. T).

56.    On January 21, 2021, Ms. Garcia-Hinojosa emailed Mr. Wagner seeking a response to the December 30, 2020 letter. *Id.* at 234 (Garcia-Hinojosa Decl., Att. U).

57.    RMI did not respond to the December 30, 2020, letter. *Id.* at 34 (Garcia-Hinojosa Decl. ¶ 92), 253 (Wagner Decl. ¶ 24).

58.    As reflected in the attached *Vaughn* Index, in response to the 2019 Request, the BLM redacted confidential commercial and financial information from a small number of documents that included RMI's bank account numbers and URLs for its document sharing platform. *Id.* at 35 (Garcia-Hinojosa Decl. ¶ 93).

59.    RMI's private document sharing platform URLs are commercial in nature because RMI contracts for access to these sites and the documents it shares on these platforms relate to RMI's commercial functions. *Id.* at 255 (Wagner Decl. ¶¶ 30-31).

60.    The BLM withheld the URLs and banking information because RMI provided this information to the BLM with an implied assurance that it would be kept confidential, and the BLM understood this to be information RMI kept private. *Id.* at 35 (Garcia-Hinojosa Decl. ¶ 93), 254-255 (Wagner Decl. ¶¶ 25-27, 29-31).

61.    The BLM understood that providing public access to RMI's bank account or its document sharing platforms could harm RMI because the public could interfere with RMI's banking or access confidential transaction-level data. *Id.* at 35 (Garcia-Hinojosa Decl. ¶ 95), 254-255 (Wagner Decl. ¶¶ 28, 32).

2022 Request

62.     On January 24, 2023, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2022 Request, but that RMI may consider confidential, and requested that if RMI "wish[es] to object to the release of this information," it should provide a written statement justifying the withholding. *Id.* at 35-36 (Garcia-Hinojosa Decl. ¶ 96).

63.     On February 15, 2023, RMI responded to the BLM's letter asserting that the documents provided were confidential. *Id.* at 255-256 (Wagner Decl. ¶ 34).

64.     Specifically, RMI asserted that the "Drill Hole Data, Map and Sampling Protocol," the scale tickets and escrow account calculations, and emails containing RMI's bank statements held commercial value, were not publicly available, and were provided to the BLM with an assurance that they would be kept confidential. *Id.*

65.     RMI asserted that its drill hole data, map and sampling protocol are confidential and RMI does not share them publicly. *Id.* at 256 (Wagner Decl. ¶¶ 36-37).

66.     RMI provided its drill hole data, map, and sampling protocol to the BLM as a part of its expansion proposal and did so with the implied and explicit assurance from the BLM that this information would remain confidential. *Id.* at 257 (Wagner Decl. ¶ 39).

67.     If RMI's drill hole data, map, and sampling protocol were released, it would harm RMI because its competitors would gain unfair insight into the geological formations within its mining claims and the quantity and type of reserves it possesses. *Id.* (Wagner Decl. ¶ 40).

68.     RMI also asserted that its scale tickets and escrow account calculations were confidential because they contained customer-specific sales, pricing and transaction-level data that RMI takes every reasonable precaution to protect from the public and its competitors. *Id.* at 257-258 (Wagner Decl. ¶¶ 41, 45).

69.     While RMI does advertise general pricing data, customer-specific pricing that may reflect bulk discounts or other competitive strategies are not disclosed publicly. *Id.* at 258 (Wagner Decl. ¶ 44).

70.     RMI provided the scale tickets and escrow account data as part of its escrow account agreement with the BLM under the express assurance that it would be maintained confidential. *Id.* (Wagner Decl. ¶ 46); 43 C.F.R. § 3601.8.

71.     If the scale tickets and escrow account data were disclosed, RMI would be harmed because competitors would know its customer-specific pricing and could negotiate lower prices to take business from RMI. *Id.* at 259 (Wagner Decl. ¶ 47).

72.     RMI also asserted that its banking information, such as its bank account numbers and transaction-level data, was confidential commercial information that it does not share publicly. *Id.* at 259-260 (Wagner Decl. ¶¶ 48, 52, 53).

73.     RMI was required to provide this information to the BLM under its escrow account agreement and provided it with the express assurance that it would be maintained confidential. *Id.* (Wagner Decl. ¶¶ 48, 52); 43 C.F.R. § 3601.8.

74.     Disclosure of RMI's banking information would cause it harm because the public could access its bank account and individual transaction data and, possibly, compromise its finances. *Id.* at 254 (Wagner Decl. ¶ 28).

75.    Finally, RMI's dial-in line and the URLs for its file sharing platforms are confidential commercial information. *Id.* at 255, 260 (Wagner Decl. ¶¶ 29-31, 55).

76.    This information relates to RMI's running of its business and were shared with the BLM under the implied assurance of confidentiality. *Id.* (Wagner Decl. ¶¶ 31, 56).

77.    Disclosure of RMI's telephonic or file sharing systems could compromise the security of such systems and provide the public access to confidential information that RMI shares through those channels. *Id.* at 255, 261 (Wagner Decl. ¶¶ 32, 57).

78.    Based on RMI's assertions of confidentiality, the nature of the information, and the BLM's assessment, the BLM withheld numerous documents in full or in part in response to the 2022 Request under exemption 4. *Id.* at 36 (Garcia-Hinojosa Decl. ¶ 99).

**Exemption 5**

79.    The BLM withheld documents pursuant to exemption 5 that are pre-decisional and part of the BLM's deliberative process, reflect confidential attorney-client communications, are attorney work-product, or contain the government's confidential commercial information. *Id.* at 38 (Garcia-Hinojosa Decl. ¶ 106).

80.    A large number of documents were withheld in full or in part pursuant to the attorney-client privilege because the documents contained: (i) communications among BLM personnel, attorneys from the Solicitor's Office, and/or DOJ attorneys in the course of seeking or providing legal advice, or seeking or providing information necessary to provide legal advice; and (ii) documents reflecting Solicitor's Office and/or DOJ attorneys' legal advice in the form of comments or drafts. *Id.* 38-39 (Garcia-Hinojosa Decl. ¶ 107).

81.     If disclosed, the redacted information would reveal confidential, attorney-client privileged material. *Id.*

82.     Additionally, as indicated in the attached *Vaughn* Index, a small number of documents were withheld in full or in part pursuant to work product protection because they were draft legal documents, or communications relating to draft briefs, declarations and other filings that were prepared by attorneys in the context of ongoing or foreseeable litigation under the APA and/or FOIA. *Id.* at 39-40 (Garcia-Hinojosa Decl. ¶ 108).

83.     If disclosed, the redacted material would reveal attorney mental impressions and work product. *Id.*

84.     The BLM also redacted agency conference line numbers, passcodes and URLs for document sharing platforms that were shared internally for the purpose of conducting official government business. *Id.* at 40 (Garcia-Hinojosa Decl. ¶ 109).

85.     These numbers relate solely to internal agency practices and are of little to no public interest. *Id.*

86.     Disclosure this information could allow individuals outside the agency to dial into the agency's telephone conference system or obtain unauthorized access to agency information and disrupt agency operations. *Id.*

87.     Pursuant to the deliberative process privilege, the BLM withheld drafts or internal documents and communications among BLM officials discussing and providing opinions related to (1) the escrow account agreement with RMI, (2) the BLM's response to RMI's proposed expansion of the Mine, which the BLM is still evaluating, (3) non-

compliance issues at the Mine, and (4) agency actions under consideration by federal officials that are unrelated to the Mine. *Id.* at 41-44 (Garcia-Hinojosa Decl. ¶¶ 111-112).

88.    The draft documents and email discussions were circulated confidentially among relevant federal officials, and the draft versions and email discussions would not be made public in the normal course of business. *Id.* at 44 (Garcia-Hinojosa Decl. ¶ 113).

89.    Draft documents generally incorporate BLM officials' proposed changes, questions, comments, and/or areas of concern or interest regarding the pre-decisional documents—as these draft documents did. *Id.* (Garcia-Hinojosa Decl. ¶ 114).

90.    The factual information withheld in the documents consists of facts selectively chosen by federal officials for inclusion in the pre-decisional draft documents or discussions. *Id.* (Garcia-Hinojosa Decl. ¶ 115).

91.    Disclosure of these documents would reveal part of the BLM's deliberative process; in particular, which facts the officials believed important to include. *Id.*

92.    Furthermore, disclosure of these documents would discourage candid discussions within the BLM. *Id.* at 44-45 (Garcia-Hinojosa Decl. ¶ 116).

**Exemption 6**

93.    The BLM withheld a few documents pursuant to exemption 6 because they contained personal information—including personal phone numbers, home addresses, tax identification numbers, and employment information—and release would constitute an unwarranted invasion of personal privacy. *Id.* at 45-46 (Garcia-Hinojosa Decl. ¶ 119).

94.    In each instance of an invocation of exemption 6, the employee has a strong interest in shielding personal details unrelated to the Mine from public review and in not

having personal cell phones called by or their homes visited by members of the public. *Id.* at 46 (Garcia-Hinojosa Decl. ¶ 121).

95.    The public has—at best—a *de minimus* interest in the redacted personal information. *Id.* (Garcia-Hinojosa Decl. ¶ 120).

96.    In total, the BLM withheld 3,035 pages in whole or in part. *Id.* (Garcia-Hinojosa Decl. ¶ 124).

## ARGUMENT

### I.    The BLM employees' declarations are entitled to deference.

"In general, FOIA request cases are resolved on summary judgment." *World Publ'g Co. v. U.S. Dep't of Justice*, 672 F.3d 825, 832 (10th Cir. 2012) (observing that a court may grant summary judgment based on declarations). To demonstrate the adequacy of its search at summary judgment, the agency may provide "reasonably detailed, nonconclusory affidavits submitted in good faith." *Liverman v. Off. of Inspector Gen.*, 139 F. App'x 942, 944 (10th Cir. 2005) (cleaned up). Such affidavits should generally "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials were searched." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003) (cleaned up). Moreover, "[i]n the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with" FOIA. *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 857 F. Supp. 2d 129, 139 (D.D.C. 2012) (cleaned up).

In addition to submitting a declaration detailing the agency's response process, an agency may also produce a *"Vaughn"* index to further substantiate the withholding of information under FOIA's exemptions. *See Hull v. I.R.S.,* 656 F.3d 1174, 1178 (10th Cir. 2011). A *Vaughn* index is a document that lists each withheld document and provides a brief description of the basis for the claimed exemption. *Id.* at 1178 n.2. A *Vaughn* index is accorded a presumption of good faith if it adequately describes the withheld records or portions of records and provides sufficient detail for the court to evaluate the claimed exemptions. *Daly v. Fed. Bureau of Prisons*, No. 09-cv-01722-PAB-BNB, 2011 WL 588046, at *6 (D. Colo. Jan. 7, 2011) (If the "*Vaughn* index and affidavits are reasonably clear, specific, and detailed, the court normally affords agency determinations substantial weight."), *report and recommendation adopted*, 2011 WL 587173 (D. Colo. Feb. 7, 2011).

Here, the BLM has attached a declaration from Laura Garcia-Hinojosa and a *Vaughn* Index that is attached to Ms. Garcia-Hinojosa's declaration. Ms. Garcia-Hinojosa is a FOIA Officer in the Colorado State Office. Statement of Material Undisputed Facts ("SMUF") ¶ 22. She has personal knowledge of Plaintiff's Requests through her work supervising and coordinating the BLM's response to the Requests. *Id.* ¶¶ 22-27. She also has relevant knowledge through her review of agency records and communications with other BLM officials as part of his official duties. *Id.* ¶¶ 22-34.

Ms. Garcia-Hinojosa's declaration and the *Vaughn* Index are detailed and thorough and are entitled to deference and the presumption of good faith. *See Daly*, 2011 WL 588046, at *6. More specifically, Ms. Garcia-Hinojosa's declaration describes in detail the BLM's search for, review of, and productions of documents responsive to the Requests.

SMUF ¶¶ 7-37. Among other things, Ms. Garcia-Hinojosa's declaration discusses: (1) the BLM's processing of the Requests, (2) the custodians identified to search for documents potentially responsive to the Requests, (3) the means by which those custodians' files were searched, (4) the BLM's review of documents from the custodians, including the application of redactions for material exempt from FOIA, (5) the BLM's production of documents, and (6) the BLM's communications with RMI regarding the documents that implicated exemption 4. *See id.* ¶¶ 7-96. The declaration also attaches, as exhibits, copies of the Requests, the BLM's production cover letters, and the BLM's correspondence with RMI. *See id.* ¶¶ 7-9, 11, 32-33, 45-47, 51-56.

The *Vaughn* Index, too, is detailed and extensive. *Id.* ¶ 37. The Index includes an entry for each document over which BLM asserted any FOIA exemption, or exemptions, to withhold any portion of the document. *Id.* Where the information is available, the Index indicates the date, author/sender, recipient, and any individuals copied on the document. *Id.* The Index further identifies all exemptions that are asserted as to each individual document and indicates whether redactions have been applied to withhold a document in full, or only in part. *See id.* The Index is 53 pages and includes 598 individual entries. *Id.*

Because the declarations and the accompanying *Vaughn* Index are detailed, nonconclusory, and reasonably describe the BLM's search and withholdings in response to the FOIA request, they are entitled to deference and a presumption of good faith.

**II.    The BLM's searches for responsive records were reasonable.**

The Tenth Circuit has held that "an agency's search for records need only be 'reasonable' in scope and intensity." *Trentadue v. F.B.I.*, 572 F.3d 794, 797 (10th Cir.

2009) (further explaining that "[t]he issue is *not* whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate"). "[A]dequacy—not perfection"—is the standard under FOIA. *DiBacco v. U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015); *see also Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) ("[A] search . . . is not unreasonable simply because it failed to produce all relevant material."). Speculation that other responsive documents may exist does not undermine that the search was reasonable. *See DiBacco*, 795 F.3d at 190-91.

In general, "declarations and affidavits are the widely accepted, even the preferable, means for an agency to respond to concerns about the adequacy of a search." *Trentadue*, 572 F.3d at 807. Declarations that support the search "need not set forth with meticulous documentation the details of an epic search for the requested records." *Murray v. Bureau of Prisons*, 741 F. Supp. 2d 156, 163 (D.D.C. 2010). An agency search is generally adequate where the affidavit shows a "good faith effort to use reasonable means to produce the information sought." *Trentadue*, 572 F.3d at 807 (cleaned up). Where a reasonable search was made, the government is entitled to summary judgment regarding the adequacy of its search. *Id*. at 807-08.

Ms. Garcia-Hinojosa's declaration demonstrates that the BLM's searches for documents responsive to the Requests were more than reasonable. First, BLM FOIA officials determined the scope of the request and identified the relevant agency employees likely to have responsive records. *See* SMUF ¶ 15. The BLM identified thirty-three employees as custodians. *Id*. ¶¶ 15, 18. The BLM reasonably determined that

searches of additional employees' documents would most likely yield documents that were duplicative of the records that were already searched. *See id.* ¶¶ 21-23.

Second, the custodian's search(es) for responsive documents were reasonable. Each custodian was provided a copy of the Requests and instructed to search for responsive documents. *Id.* ¶ 16. Custodians utilized the timeframe provided by Plaintiff in its Requests. *Id.* ¶ 14. Most custodians performed more than one search. *Id.* ¶ 20.

The employees searched the records locations most likely to contain responsive records, including hard-copy, electronic, and/or email files, as appropriate. *Id.* ¶ 19. The employees employed the search method they identified as most likely to capture responsive documents, based on their knowledge of their records and communications, including using key words such as "Quarry," "RMI," or "limestone." *Id.* ¶¶ 17-18.

Third, the search was reasonable on its face. The search returned an extraordinary number of potentially responsive documents. Experienced FOIA personnel, in concert with subject-matter experts that were often also custodians of the applicable documents, then carefully reviewed the documents for responsiveness and applicable exemptions. *Id.* ¶¶ 24-27. Over the course of thirteen rolling productions, BLM produced 2,800 documents encompassing more than 20,000 pages in response to the Requests. *Id.* ¶ 34.

The BLM's search for responsive documents was thorough, exceeding the reasonableness standard, and Defendants are entitled to summary judgment.

III.    **The BLM's withholdings under FOIA exemptions were proper.**

As discussed below, the BLM asserted exemptions 3 and 6 to withhold limited information from a small number of documents. The BLM asserted exemptions 4 and 5—

for confidential commercial information, attorney-client privilege, work product, government commercial information, or deliberative process—to withhold a larger number of documents in whole or in part.

### A. The BLM properly withheld material under exemption 3.

The BLM withheld a small number of documents in response to the 2018 and 2022 Requests under exemption 3, which shields from release records that are protected from disclosure by other statutes. *See* 5 U.S.C. § 552(b)(3). In this case, exemption 3 was applied pursuant to two statutory provisions: (1) the ARPA, and (2) the Procurement Integrity Act. SMUF ¶ 38. The ARPA protects from release to the public "[i]nformation concerning the nature and location of any archeological resource for which the excavation or removal requires a permit." 16 U.S.C. § 470hh. The Procurement Integrity Act prohibits disclosure of "contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract." 41 U.S.C. § 2102(a)(1).

Here, pursuant to ARPA, the BLM withheld information related to the specific location of archeological resources for which removal requires a permit, by redacting those areas in maps or redacting textual information about the resource's locations. SMUF ¶ 39. The BLM determined that releasing this information would not further the purposes of ARPA and would create a risk of harm to the archeological sites because it would increase the opportunity for the unauthorized excavation and removal of those resources. *Id.* ¶ 40. In addition, the BLM withheld a small number of documents pursuant to the Procurement Integrity Act to protect disclosure of pre-award bids, proposal information, and source selection information. *Id.* ¶ 41. The BLM determined that

releasing this information would create a risk of harm to the government's procurement process and ability to negotiate bids. *Id.* ¶ 42.

### B. The BLM properly withheld material under exemption 4.

The BLM withheld documents that contained confidential commercial information pursuant to exemption 4. Where withheld records do not contain trade secrets, an agency must establish that the records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential to sustain the burden of showing that exemption 4 was properly applied." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 58 F.4th 1255, 1262 (D.C. Cir. 2023).

Courts have interpreted the phrase "commercial or financial" to have its plain and ordinary meaning—it "serves a commercial function or is of a commercial nature," or in other words "pertains to the exchange of goods or services or the making of a profit." *Id.* at 1263 (cleaned up); *see also Pomares v. Dep't of Veterans Affs.*, No. 23-55205, 2024 WL 3765300, at *5 (9th Cir. Aug. 13, 2024) (applying the plain meaning and finding commercial information "pertains to 'business [or] trade,'" and financial information "relates to 'the management of money and other assets.'" (cleaned up)). "Indeed, in enacting FOIA, Congress sought to shield from public release intrinsically valuable business information such as business sales statistics, inventories, customer lists, and manufacturing processes." *Id.* (cleaned up).

FOIA defines person broadly to "include[] an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2);

*see also Jud. Watch, Inc. v. Exp.–Imp. Bank*, 108 F.Supp.2d 19, 28 (D.D.C. 2000) ("[T]he term 'person' in the context of Exemption 4 applies to a wide range of entities").

Information is "confidential" when the "information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy." *Food Mkt. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019) (cleaned up).

Here, the BLM withheld the following categories of documents under exemption 4: (1) bank account information and URLs for document sharing platforms; (2) drilling hole data, maps, and a sampling protocol; and (3) scale tickets and escrow account statements. SMUF ¶¶ 43, 49, 58, 78.

**Bank account information and document sharing platform URLs.** The BLM redacted confidential commercial and financial information from a small number of documents that included RMI's and its predecessor, Pitkin Corporation's, bank account numbers and URLs for RMI's private document sharing platforms. SMUF ¶¶ 50, 59. This information is both commercial and financial. RMI's bank account information is invariably financial information because it relates to RMI's "management of [its] money." *See Pomares*, 2024 WL 3765300, at *5. RMI's private document sharing platform URLs are commercial in nature because RMI contracts for access to these sites and the documents it shares on these platforms relate to RMI's commercial functions. SMUF ¶ 59.

The BLM received RMI's bank account information and document sharing URLs from RMI, a person for purposes of FOIA. *See* 5 U.S.C. § 551(2). And RMI's URLs and bank account information are confidential in nature. SMUF ¶ 60, 72. As described more fully in Mr. Wagner's declaration, RMI treats its file sharing platforms and banking

information as confidential and does not share this information with the public. *Id.* ¶¶ 60-61. The BLM provided RMI with an implied assurance that this sensitive financial information and document sharing systems would remain private. *Id.* ¶¶ 59-60, 75.

**Drill hole data, maps, and sampling protocol.** In response to the 2022 Request, the BLM withheld RMI's drilling hole data, maps, and a sampling protocol. *Id.* ¶ 78. As to the first factor, this information is commercial in nature because it relates directly to the core of RMI's mining business—that is, its mining claims and how it drills. *Id* ¶ 67. As to the second factor, the BLM obtained the information from a person, RMI. *See* 5 U.S.C. § 551(2). RMI provided this information to the BLM because it was required as part of RMI's proposed plans of operations modifications. SMUF ¶ 66.

As to the third factor, as described more fully in Mr. Wagner's declaration, RMI takes all reasonable precautions to protect this information from the public and its competitors. *Id.* ¶ 65. Indeed, RMI does not publicly disclose its drilling information because it directly relates to how its business operates and its competitive advantages. *Id*. The BLM, through its regulations, provided RMI an express assurance that the information would remain confidential. *Id.* ¶ 66. Specifically, RMI submitted this information to the BLM pursuant to 42 C.F.R. § 3600. That regulation provided RMI an express assurance that if RMI asserted the information is confidential, "BLM will keep all data and information confidential to the extent allowed by [the Department's FOIA regulations]." 43 C.F.R. § 3601.8. And, here, RMI did assert this information was confidential. SMUF ¶ 66. Thus, the BLM provided RMI an express assurance that this information would remain confidential. Moreover, disclosure of this information would

harm RMI because its competitors could gain unfair insight into RMI's mining claims as well as the quantity and type of reserves RMI possesses. *Id.* ¶ 67.

**Scale tickets and escrow account statements.** In response to the 2022 Request, the BLM also withheld RMI's scale tickets and escrow account statements. *Id.* ¶ 78. This information is both financial and commercial because it provides the specifics of RMI's commercial operations, including customer names, customer-specific pricing, and order quantity information. *Id.* ¶ 68. Indeed, such sales statistics, investors, and customer lists invariably are commercial in nature. *See Citizens for Resp. & Ethics in Washington,* 58 F.4th at 1263 ("Exemption 4 paradigmatically applies to" "sales statistics, profits and losses, and inventories, or [that] relate to the income-producing aspects of a business.").

The BLM obtained these files from RMI, a person for purposes of FOIA, as required documentation to support RMI's escrow account payments. SMUF ¶ 6.

RMI keeps its scale tickets and escrow account statements confidential and provided these documents to the BLM under an express and implied assurance of privacy. First, RMI does not publicly disclose its scale tickets and escrow account statements or the underlying information, such as customer lists and customer-specific pricing. SMUF ¶ 69. While RMI publicly provides general pricing, its customer-specific pricing—which varies based on sales volume, customer relationship and other competitive factors—is not publicly available. *Id.*

Second, RMI provided this information to the BLM with the express assurance that it would remain confidential under BLM regulations. *Id.* ¶ 70. Specifically, Part 3600

provides that if the company asserts the information is confidential, as RMI did here, then the BLM will maintain the information as confidential. *See* 43 C.F.R. § 3601 .8.

Moreover, release of this information would harm RMI. As explained in Mr. Wagner's declaration, disclosure would undermine RMI's ability to compete for customers and could allow RMI's competitors to undercut RMI's pricing. *Id.* ¶ 71.

In sum, the BLM properly withheld information pursuant to exemption 4.

### C. The BLM properly withheld material under Exemption 5.

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 therefore incorporates the common law and governmental privileges and protections that protect materials from discovery in litigation, including the attorney-client and deliberative process privileges as well as the protections for work product and confidential commercial information. *See Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (*Trentadue II*). Here, Defendants withheld information pursuant to exemption 5 under the attorney-client and deliberative process privileges, and the work product and confidential information protections.

***Attorney-Client Privilege.*** To assert attorney-client privilege, the information must be between attorney and client, confidential, and of a legal nature. *Roe v. Catholic Health Initiatives Colo.*, 281 F.R.D. 632, 636 (D. Colo. 2012). The privilege also protects internal communications that repeat or discuss legal advice. *See Moffatt v. Wazana Bros. Int'l*, No. 14-1881, 2014 WL 5410201, at *2 (E.D. Pa. 2014) (collecting cases).

Here, BLM properly withheld a large number of documents in whole or in part pursuant to the attorney-client privilege. Generally, the documents that were withheld included: (i) communications among BLM personnel and Solicitor's Office attorneys, and/or DOJ attorneys, in the course of seeking or providing the attorney's legal advice, or seeking or providing information necessary to provide legal advice; and (ii) documents reflecting Solicitor's Office and/or DOJ attorneys' legal advice in the form of comments or drafts. SMUF ¶ 80. The information withheld was exchanged confidentially and was legal in nature. *Id.* The *Vaughn* Index provides a detailed description of each instance in which the attorney-client privilege was asserted, and the basis for those assertions. *Id.* ¶ 37.

***Attorney Work Product.*** The Supreme Court has explicitly acknowledged that the work product privilege falls within exemption 5. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Attorney work product protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A).

In this case, the BLM applied work product protection to withhold a small number of documents. SMUF ¶ 82. The *Vaughn* Index provides a detailed description of each instance in which material was withheld as protected work product, and the basis for the withholding. *Id.* ¶ 37. Among other information, the BLM withheld drafts of legal documents and communications regarding those draft documents as protected work product. *Id.* ¶ 82. Draft documents including briefs, declaration, and other litigation documents prepared by Solicitor's Office and DOJ attorneys in the course of ongoing litigation, as well as communication regarding such documents, are exempt from

disclosure as work product. *See, e.g.*, *Barouch v. U.S. Dep't of Justice*, 962 F. Supp. 30, 63-64 (D.D.C. 2013).

 ***Confidential Information.*** Internal agency conference call numbers, passcodes and share drive URLs were redacted pursuant to exemption 5.

 When the government enters the marketplace as an ordinary commercial buyer, exemption 5 protects against disclosure of certain governmental confidential commercial information. *Federal Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 359-60 (1979); *Gov't Land Bank v. General Sers. Admin.*, 671 F.2d 663, 665 (1st Cir. 1982). In this context, exemption 5 applies "where the document contains 'sensitive information not otherwise available,' and disclosure would significantly harm the government's commercial interest." *Gov't Land Bank*, 671 F.2d at 666.

 In this case, internal agency conference call numbers, passcodes and document sharing URLs are exempt from disclosure. This information constitutes "intra-agency" material because it is shared internally for the purpose of conducting official government business. SMUF ¶ 84. Moreover, this information qualifies as "confidential commercial information" because the government entered the marketplace as an ordinary commercial buyer. *See id.*; *Rocky Mountain Wild v. U.S. Bureau of Land Mgmt.*, 445 F. Supp. 3d 1345, 1365 (D. Colo. Mar. 23, 2020) (conference numbers and passcodes were properly withheld under exemption 5). Disclosure of the numbers, passcodes or URLs could allow individuals outside the agency to dial into the agency's telephone conference system or access the agency's file sharing system and disrupt agency operations or obtain unauthorized access to agency information. SMUF ¶ 86.

***Deliberative Process.*** Deliberative process "shields documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Trentadue II,* 501 F.3d at 1226 (cleaned up). "[T]he deliberative process privilege is primarily designed to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* (cleaned up). To apply, the documents must be "both predecisional and deliberative." *Id.* at 1227. Accordingly, courts have found that the deliberative process privilege protects from disclosure, among other things, (1) "predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision," *id.,* (2) "[p]roposed drafts of a non-final agency decision that are still undergoing review, debate, and editing," *Reps. Comm. for Freedom of the Press v. F.B.I.*, 3 F.4th 350, 364 (D.C. Cir. 2021), and (3) "[d]iscussions among agency personnel about the relative merits of various positions which may be adopted," *Leopold v. Off. of Dir. of Nat'l Intel.*, 442 F. Supp. 3d 266, 274 (D.D.C. 2020).

Here, the BLM withheld draft documents, communications regarding draft documents, and similar pre-decisional and deliberative discussions that were shared in open and frank exchanges of ideas, drafts, and postures within the BLM. SMUF ¶ 87. For example, the draft documents that were withheld include memoranda, talking points, and other pre-decisional documents prepared by BLM employees in the course of ongoing evaluations of agency actions related to the Mine, as well as communications regarding such documents. *Id.* The *Vaughn* Index provides a detailed description of each instance

in which material was withheld as deliberative, and the basis for the withholding. *See* SMUF ¶ 37.

Disclosure of these documents would discourage candid discussions within the BLM. SMUF ¶ 92. Individual employees could be discouraged from sharing a full range of ideas or opinions if these documents were made public. *Id*. Accordingly, these withholdings were proper. *See Trentadue*, 501 F.3d at 1227.

### D. The BLM properly withheld material under Exemption 6.

The BLM withheld limited information under exemption 6, which protects "personnel . . . files[,] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. 552(b)(6), including "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy,'" *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, No. 18-CV-03065-MEH, 2021 WL 825985, at *22 (D. Colo. Mar. 4, 2021), *aff'd*, 56 F.4th 913 (10th Cir. 2022).

Here, the BLM redacted information individuals' home addresses, personal telephone numbers, and tax identification numbers. SMUF ¶ 93. The individuals to whom this information pertains have a substantial privacy interest in withholding this personal information, and there is little or no public interest in the disclosure of this information. *Id*. ¶¶ 94-95. These withholdings were therefore proper pursuant to exemption 6.

Accordingly, the BLM properly withheld material as exempt under FOIA.

### CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

Respectfully submitted on October 9, 2024.

MATTHEW T. KIRSCH
Acting United States Attorney

*s/ Julia M. Prochazka*
Julia M. Prochazka
Assistant United States Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
(303) 454-0100
Julia.Prochazka@usdoj.gov

*Attorney for Defendants*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on October 9, 2024, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will send notification of such filing to the following email addresses:

Roger Flynn
roger@wmaplaw.org

Jeffery C. Parsons
jeff@wmaplaw.org

Travis E. Stills
stills@eclawoffice.org

*s/ Julia M. Prochazka*
U.S. Attorney's Office