IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-00445-GPG-RTG

GLENWOOD SPRINGS CITIZENS' ALLIANCE,

     Plaintiff,

v.

U.S. DEPARTMENT OF THE INTERIOR and
U.S. BUREAU OF LAND MANAGEMENT,

     Defendants.

---

## ORDER

Before the Court are Defendants' Motion for Summary Judgment (D. 25), filed by Defendants United States Department of the Interior (DOI) and Bureau of Land Management (BLM), and Plaintiff's Cross Motion for Summary Judgment (D. 27), filed by Plaintiff Glenwood Springs Citizens' Alliance (GSCA). The Court GRANTS Defendants' motion and DENIES Plaintiff's motion for the following reasons.

## I.  BACKGROUND

Plaintiff, a wildlife and land conservation group, alleges that Defendants violated the Freedom of Information Act (FOIA), 5 U.S.C. § 552, et seq., by improperly responding to

1

Plaintiff's FOIA requests for documents related to the mid-Continent Quarry (Mine) near Glenwood Springs, Colorado.[1]

### A. The Court's Practice Standards for Summary Judgment Motions

To assist with the resolution of motions for summary judgment under Federal Rule of Civil Procedure 56, this District's Local Rules require that a "motion under Fed. R. Civ. P. 56 for summary judgment or partial summary judgment shall include a statement of undisputed facts." D.C.COLO.LCivR 56.1(a).

The Court, along with five other District Judges, have adopted a set of Uniform Practice Standards that include procedures specific to how the parties must create the statement of undisputed facts and respond.  *See* GPG Civ. Practice Standard 7.1D—Motions for Summary Judgment Pursuant to Fed. R. Civ. P. 56.  Although others have elected to depart from the uniform rules, this Court uses the default procedures for summary judgment, including those that apply to resolution of factual disputes.  The relevant subsection provides:

> (b) Due to the voluminous factual materials often submitted with Rule 56 motions, all such motions must comply with the following:
>
> (1) In a section of the brief required by D.C.COLO.LCivR 56.1(a) styled "Statement of Undisputed Material Facts," the movant shall set forth in simple, declarative sentences, separately numbered and paragraphed, each material fact that the movant believes is not in dispute and that supports the movant's claim that movant is entitled to judgment as a matter of law.
>
> (2) Each material fact must be accompanied by a specific reference to material in the record that establishes that fact. General references

---

[1] Plaintiff also filed a case directly challenging various actions related to the Mine that has been dismissed as effectively moot in view of final agency action barring further mining of certain materials without legal compliance. *See Glenwood Springs Citizens' Alliance v. U.S. Dep't of the Interior*, 1:20-cv-00658-CNS, ECF No. 70 (D. Colo. Jan 14, 2025).

to pleadings, depositions, or documents are insufficient if the document is more than one page in length.

(3) A general reference is sufficient only if the nature of the material fact does not permit a specific reference (e.g., "The contract contains no provision for termination.").

(4) Any party opposing the motion for summary judgment shall, in a section of the brief styled "Response to Statement of Undisputed Material Facts," admit or deny the movant's asserted material facts. The admission or denial shall be made in separate correspondingly numbered paragraphs. Any denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial.

(5) If the party opposing the motion believes that there are additional disputed questions of fact that have not been adequately addressed in the submissions made pursuant to subsection (4) above (e.g., disputed facts concerning an affirmative defense), the party shall, in a separate section of the brief styled "Statement of Additional Disputed Facts," set forth in simple, declarative sentences, separately numbered and paragraphed, each additional, material disputed fact that undercuts the movant's claim that it is entitled to judgment as a matter of law. Each such fact shall be accompanied by a specific reference to material in the record establishing the fact or demonstrating that it is disputed.

GPG Civ. Practice Standard 7.1D(b).

This procedure helps to clarify and increase the accuracy of the determinations of what facts are undisputed under Rule 56. The utility of such procedures is apparent from their ubiquity. Similar, if not identical, procedures are used by other judges in this District who have not adopted the Uniform Practice Standards. *See* Philip A. Brimmer Civil Practice Standard III.F.3.b (imposing similar requirements); Daniel D. Domenico Civil Practice Standard III.E.1 (same); William J. Martínez Practice Standard III.F.3 (same). Many other districts and sister courts throughout the country have adopted similar procedures, either through the local rules or the practice standards. *E.g.*, Central Dist. Cali. L.R. 56-1 (requiring a "Statement of Uncontroverted

Facts" wherein "Each such fact must be numbered and must be supported by pinpoint citations (including page and line numbers, if available) to evidence in the record").

Although such procedures are quite common, particularly within this District, they are still often overlooked or not complied with by litigants.  *See* William J. Martínez Practice Standard at cover page (nothing the summary judgment procedures among those "Commonly Overlooked"). This is unfortunate, because such procedures are grounded in and consistent with the requirements of Rule 56 regarding how factual positions are supported and addressed.  The relevant subsection of Rule 56 provides:

> (c) Procedures.
>
> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).  Rule 56 also provides the relevant sanctions for failure to properly support or address factual assertions in the context of a motion for summary judgment.

> (e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

Because the Court's practice standards "give an opportunity to properly support or address" any fact, the Court will generally ignore assertions of fact that that are improperly supported and, when a fact is not properly addressed, "consider the fact undisputed for purposes of the motion." *Id.*; *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Here, the Court draws the operative facts as set forth from Defendants' Movant's Statement of Undisputed Facts (D. 25 at 2–21).[2]  The facts are identified by paragraph number.  Between them, the Parties assert 167 facts as undisputed.  Sorting them out, even using the Court's procedures, is a monumental task not made simpler by how the Parties have presented their facts and disputes.

---

[2] The Court does not specifically address Plaintiff's Movant's Statement of Undisputed Material Facts (D. 27 at 7–21) because its motion will be denied as moot in light of granting Defendants' motion.

Plaintiff's briefing is particularly problematic. In its own assertion of undisputed facts, whole pages can pass without any citation to a supporting fact. For example, for its asserted facts 57 through 63, Plaintiff cites no evidence whatsoever (D. 27 at 18–19). This violates Rule 56(c)(1) and the Court's practice standards. Such asserted "facts" will not be considered.

Similarly, Plaintiff fails to address many facts asserted by Defendants or does so in a way that is incoherent. This failure extends to critical issues. For example, Defendants' asserted facts 21 through 23 state:

> 21. Upon initial review of the documents received from the custodians, it was determined that no other custodians should be searched, as their records were not reasonably likely to contain unique documents not already captured by the searches the already-identified custodians had performed. Id. at 23 (Garcia-Hinojosa Decl. ¶ 50).
>
> 22. In consultation with the Mine subject matter experts, the FOIA Officer, Laura Garcia-Hinojosa, determined that the Colorado River Valley Field Office—which covers the location of the Mine—and the Colorado State Office would possess documents or communications responsive to the Requests. Id. at 22-23 (Garcia-Hinojosa Decl. ¶ 47).
>
> 23. Any communications with other offices, including Washington D.C., would have been between that office and the Colorado State Office, and would have been captured by the searches conducted by the Colorado-based custodians. Id. at 23.

(D. 25 at 9–10).

Plaintiff responds:

> 21. GSCA admits, and further notes that BLM acknowledges that the Washington Offices of the BLM and Interior Department were not searched. See ¶18 above.
>
> 22. GSCA admits.

6

> 23. GSCA admits that the Colorado BLM did not search any of the BLM or Interior Department offices in Washington. BLM relies on the Declaration of Garcia-Hinojosa, which states that the internal searches in Colorado "would tend to indicate that a non-Colorado BLM official was substantially involved in matter." BLM Appx. 022-23 (¶47).   BLM offers no evidence that these Washington officials were not "substantially involved in [the] matter." Nor does BLM provide support for its decision to limit its search to only officials who were "substantially involved in the matter." GSCA's Cross-Motion filed today further details BLM's failure to conduct a reasonable search by failing to conduct any search of the BLM/DOI headquarters offices.

(D. 26 at 17–18).

This response fails to comply with Court's practice standards and is somewhat incoherent. For fact 21, Plaintiff refers back to a prior response ("See ¶18 above."), but the cited paragraph merely says "GSCA admits paragraphs 1-18."  Then, for fact 23, Plaintiff does not address the asserted fact.  It admits something not stated in the asserted fact ("GSCA admits that the Colorado BLM did not search any of the BLM or Interior Department offices in Washington") and does not dispute anything stated in the asserted fact.  Instead, Plaintiff makes some arguments about who was substantially involved that are irrelevant to the stated fact, namely, that "communications with other offices . . . would have been captured by the searches conducted by the Colorado-based custodians."  Accordingly, Plaintiff's asserted fact 23 is deemed admitted in accordance with the Court's practice standards and Rule 56(c).  In accordance with Rule 56(c), Local Rules, and the Uniform Practice Standards, the Court finds the following facts undisputed for the purposes of deciding the motions.

**B. Undisputed Material Facts**

*1. The Mine*

The Mine began operating in 1982, providing crushed limestone to a nearby mining complex (D. 25 at ¶ 1).  In 2016, Rocky Mountain Industrials, Inc. (RMI, formerly Rocky Mountain Resources or RMR)—a for-profit corporation—purchased the Mine and began to operate it pursuant to BLM permits (D. 25 at ¶ 2).  Beginning in November 2018, RMI began submitting proposals to modify operations at the Mine to expand the current site footprint, which have been, or currently are, under review by the BLM (D. 25 at ¶ 3).  The BLM's evaluation of RMI's proposed expansion included, among other things, a Determination of Common Variety (DCV) and various studies, including hydrologic, cave/karst, and ethnographic (D. 25 at ¶ 4).  In addition, RMI has established an escrow account into which it pays amounts based on its revenues that will cover the potential royalties owed to the BLM depending on the DCV (D. 25 at ¶ 5).  As the escrow payments correspond to RMI's revenues, RMI submits to the BLM sales data to substantiate those payments (D. 25 at ¶ 6).

*2. Plaintiff's FOIA Requests and Defendants' Initial Productions*

On June 12, 2018, Plaintiff submitted a FOIA request (the 2018 Request) to the BLM's Colorado State Office seeking "[a]ll records involve the [Mine] . . . (starting in 1982) to the present day" (D. 25 at ¶ 7).  In six installments, the BLM produced 7,500 pages of responsive records, 149 pages with redactions, and withheld 263 pages subject to exemptions set forth in the *Vaughn* Index (D. 25 at ¶ 8).[3]

---

[3] *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

On November 8, 2019, GSCA submitted a second FOIA request (the 2019 Request) to the BLM's Colorado State Office seeking "the same records as described" in the 2018 Request "from the initial June 12, 2018 FOIA request date until the present day" (D. 25 at ¶ 9). Over four installments, the BLM produced over 9,000 pages in full, 1,080 pages with redactions, and withheld 232 pages subject to exemptions set forth in the *Vaughn* Index (D. 25 at ¶ 10).

On November 2, 2022, GSCA submitted a third FOIA request (the 2022 Request) to the BLM's Colorado State Office seeking the same information as the 2018 and 2019 FOIA Requests from "November 8, 2019, . . . until the present day" (D. 25 at ¶ 11). Over three installments, the BLM produced over 3,300 pages in full, 718 pages with redactions, and withheld 357 pages subject to exemptions set forth in the *Vaughn* Index (D. 25 at ¶ 12).

Plaintiff filed formal appeals to DOI's FOIA office for all three Requests (D. 25 at ¶ 13).

### 3.  *Defendants' Searches*

In consultation with the Mine subject matter experts, the FOIA Officer, Laura Garcia-Hinojosa, determined that the Colorado River Valley Field Office—which covers the location of the Mine—and the Colorado State Office would possess documents or communications responsive to the Requests (D. 25 at ¶ 22). Any communications with other offices, including Washington D.C., would have been between that office and the Colorado State Office, and would have been captured by the searches conducted by the Colorado-based custodians (D. 25 at ¶ 23). In total, across all three Requests, the BLM identified thirty-three individuals as likely to have responsive records (the custodians), and the records of those custodians were searched (D. 25 at ¶ 15).

The BLM provided the custodians a copy of the Requests and instructed them to search all of their electronic and paper files (D. 25 at ¶ 16). Most of the custodians searched their own

documents, using the search parameters they identified as most likely to identify potentially responsive documents, as the custodians themselves were best-positioned to know (i) where they would have saved potentially responsive documents in their files, and (ii) what search parameters would be best aimed to locate those documents (D. 25 at ¶ 17). The BLM used the date ranges Plaintiff provided in its Requests to search for responsive documents (D. 25 at ¶ 14).

The custodians' searches encompassed the following search terms and date parameters:

> a. Chad Mickschl: Search terms: RMR, Bobby Wagner, Mid Continent, Rocky Mountain Resources; Dates: 1982 to November 12, 2019.

> b. Lisa Dawson: Search terms: RMR, Mid-Continent, Quarry, Rocky Mountain Resources, Mid Continent, Bernhardt. Quarry, RMI, DCV; Dates: 1982 to November 3, 2022.

> c. Kim Leitzinger: Search term: RMR; Dates: 1982 to November 12, 2019. Id.

> d. Jessica Lopez: Search terms: RMR, Cal-X, Mid-Continent Resources, Pitkin, Iron, Mid-Continent Quarry, Mid-Continent Resources, Mid-Continent Quarry; Dates: 1982 to November 12, 2019.

> e. Hilary Boyd: Search terms: Amy Way, Bobby Wagner, Aleta Powers, Dan Neubaum, Mexican Spotted Owls, RMR, quarry, limestone, mine expansion, Mid-Continent, MSO, spotted owl, Oreohelix, RMI, Quarry, Limestone, Witch, Snail; Dates: 1982 to November 3, 2022.

> f. Suzanne Mehlhoff: Search terms: RMR, Mid-Continent, Quarry; Dates: 1982 to June 18, 2018.

> g. Carla DeYoung: Search terms: RMR, CalX, Bobby Wagner, Jessica Lopez Pearce, Mid-Continent; Dates: 1982 to November 12, 2019.

> h. Erin Leifeld: Search terms: RMR, ERO, Kathy Croll, Sean Larmore, Mid-Continent, Bobby, Bobby Wagner, S#795, 5GF876,

RMI, Mid-Continent, Mid-Continent Quarry, Limestone; Dates: 1982 to November 3, 2022.

i. Miles Gurtler: Search terms: RMR, Mid-Continent; Dates: 1982 to November 12, 2019.

j. Nicolas Sandoval: Search terms: Limestone, RMR, Mid-Continent, Rocky Mountain Resources, Bernhardt, Brownstein, RMI, Glenwood Springs, Mid-Continent Quarry, Common Variety; Dates: 1982 to November 3, 2022.

k. Steve Ficklin: Search terms: RMR, Mid-Continent; Dates: 1982 to November 12, 2019.

l. Helen Mary Johnson: Search terms: RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

m. Andrew Archuleta: Search terms: RMR, Rocky Mountain Resources, Bernhardt, Brownstein, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

n. Larry Sandoval: Search terms: RMR, Cal-X, Mid-Continent Resources, Pitkin, Iron, Mid-Continent Quarry, RMI, Limestone; Dates: June 12, 2018 to November 3, 2022.

o. Kristy Wallner: Search terms: RMR, CalX, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

p. Jill Bogdanovich: Search term: RMR; Dates: June 12, 2018 to a November 12, 2019.

q. Doug Siple: Search terms: RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

r. Erin Jones: Search terms: RMR, MOU, RMR NEPA, EIS; Dates: June 12, 2018 to November 12, 2019.

s. David Boyd: Search terms: Secretary, Bernhardt, RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

t. Brian Hopkins: Search term: Rocky Mountain Resources; Dates: June 12, 2018 up to and including November 12, 2019.

u. Brian Achziger: Search terms: RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: November 8, 2019 to November 3, 2022.

v. Stephanie Connolly: Search terms: RMR, RMI, Mid-Cont Quarry, Cal X, MCR; Dates: November 8, 2019 to November 3, 2022.

w. Greg Larson: Search terms: RMI, RMR, Quarry, Limestone, compliance; Dates: November 8, 2019 to November 3, 2022.

x. David Lazorchak: Search terms: RMI, Mid-Continent, Quarry, Limestone; Dates: November 8, 2019 to November 3, 2022.

y. Brittany Cocina: Search terms: RMI, MidContinent, Mid-Continent Quarry, MCQ, RMR; Dates: November 8, 2019 to November 3, 2022.

z. Sharon Sales: Search terms: RMI, Mid Continent Quarry, RMR; Dates: November 8, 2019 to November 3, 2022.

aa. Monte Senor: Search terms: RMI, Mid-Continent, Quarry, Limestone; Dates: November 8, 2019 to November 3, 2022.

bb. Steve Hall: Search term: RMI; Dates: November 8, 2019 to November 3, 2022.

cc. Kirby Shedlowski: Search terms: quarry, glenwood, mid-continent, RMR, Rocky Mountain Resources; Dates: November 8, 2019 to November 3, 2022.

dd. The BLM does not have a contemporaneous record of the dates and search terms AJ Johnson used, but agency records indicate her search identified 90 pages responsive to the 2019 Request.

ee. The BLM does not have a contemporaneous record of the dates and search terms Tom Fresques used, but agency records indicate his search identified 120 pages responsive to the 2019 Request.

ff. The BLM does not have a contemporaneous record of the dates and search terms Gloria Tibbetts used, but agency records indicate her search identified 1572 pages responsive to the 2019 Request.

gg. The BLM does not have a contemporaneous record of the dates
and search terms Ben Smith used, but agency records indicate his
search identified 10 pages responsive to the 2019 Request.

(D. 25 at ¶ 18).

Locations searched in connection with the Requests included physical hard copy files, external and internal computer hard drives, custodians' email communications and attachments, BLM's local servers at the Colorado River Valley Field Office, and BLM Colorado State Office shared drive (D. 25 at ¶ 19).[4]  For most custodians, two or three separate rounds of searches were conducted (D. 25 at ¶ 20).

### 4.  Defendants' Review of Records and Additional Productions

Once custodians had identified potentially responsive records, Ms. Garcia-Hinojosa reviewed the documents (D. 25 at ¶ 24). First, Ms. Garcia-Hinojosa reviewed the potentially responsive documents to eliminate those not responsive to the Requests (D. 25 at ¶ 25).  Next, Ms. Garcia-Hinojosa determined which documents were not subject to any applicable exemption and should be released in full (D. 25 at ¶ 26).  Finally, Ms. Garcia-Hinojosa reviewed the documents for the applicability of any FOIA exemptions and applied redactions to all or parts of the pages of each document as appropriate (D. 25 at ¶ 27).  In general, the applied redactions included text indicating the exemption being asserted (D. 25 at ¶ 28).

Upon initial review of the documents received from the custodians, it was determined that no other custodians should be searched, as their records were not reasonably likely to contain

---

[4] Plaintiff makes a variety of statements about this fact but does not deny it (D. 26 at 17).  Therefore, it is deemed admitted.

unique documents not already captured by the searches the already-identified custodians had performed (D. 25 at ¶ 21).

Between November 2018 and September 2023, the BLM made thirteen productions to Plaintiff in response to the Requests (D. 25 at ¶ 29). During the pendency of this case, Defendants provided two additional discretionary releases of documents to Plaintiff (D. 25 at ¶ 30).

During this case, attorneys in the DOI and the DOJ reviewed each exemption assertion (D. 25 at ¶ 31). In several instances the BLM agreed to limit or fully remove previous exemption applications to limit the issues and documents at issue in this motion (*id*.). These releases included letters between the BLM and RMI related to the Requests and a re-production of the documents attached to those letters (D. 27 at ¶ 32).

On September 27, 2024, the BLM re-produced to Plaintiff all the documents that it had previously produced in response to the Requests (D. 25 at ¶ 33). The re-production included Bates stamps because the prior responses did not include them (*id*.). And that production included documents for which it had been determined that the redactions applied when the documents were initially produced should be reduced or removed (*id*.). In that production, the BLM released in whole or in part over 750 additional pages that had been previously withheld (*id*.).

In total, the BLM has produced 2,800 documents and 20,764 pages in full to Plaintiff in response to the Requests (D. 25 at ¶ 34).

### 5. *The* Vaughn *Index and Defendants' Asserted Exemptions*

In the course of its review of documents potentially responsive to the Requests, the BLM determined that certain information should be withheld under FOIA exemptions 3, 4, 5, and 6 (D.

25 at ¶ 35).[5]  The documents responsive to the Requests were reviewed both in the BLM's initial

evaluation of the Requests and again during the pendency of this case to ensure that all reasonably

segregable information not subject to a FOIA exemption has been released (D. 25 at ¶ 36).[6]

A description of all of the material withheld in whole or in part pursuant to FOIA

exemptions, and the bases for asserting those exemptions, are set forth in the *Vaughn* Index filed

as Attachment C to Garcia-Hinojosa's Declaration (D. 25 at ¶ 37).

During its evaluations of the Requests, the BLM sought to consult with RMI when it

appeared that the BLM was preparing to release information that RMI may consider confidential

(D. 25 at ¶ 44).  In its responses to the Requests, the BLM withheld some[7] of RMI's and Pitkin

Iron's confidential commercial information (D. 25 at ¶ 43).  On August 13, 2019, the BLM sent

RMI a letter attaching documents that the BLM identified as responsive to the 2018 Request, but

that RMI may consider confidential, and requested that if RMI "wish[es] to object to the release

of this information," it should "provide a written statement setting forth the specific and detailed

justification for withholding any portion" (D. 25 at ¶ 45).  On August 29, 2019, RMI responded

via email stating "[w]e did not see anything contained [in the provided documents] that we would

classify as trade secret or as confidential" (D. 25 at ¶ 46).

---

[5] As discussed below, Plaintiff has withdrawn its objection to the withholdings under FOIA exemptions 3 and 6. Accordingly, related facts are omitted.

[6] Plaintiff purports to dispute this fact but provides no specific reference to material in the record supporting the denial (D. 26 at 18).  Even when the Court goes beyond what is required by the Rules and looks to the "discussion below on BLM's failure to release all reasonably segregable information" (*id.*), that section contains only a general citation to 24 undifferentiated pages of records discussed below.   Accordingly, this fact is deemed admitted.

[7] Plaintiff purports to dispute that such information was withheld with an improperly placed extended argument, but its 'denial' boils down to asserting that Defendants previously produced information similar to the information that they have withheld as classified in response to a later Request (D. 26 at 18–20).  While arguing that some information was improperly withheld, it does not dispute the proposition some confidential commercial information was withheld (*id.*)  Thus, the asserted fact is modified, and it is deemed undisputed that "some" such information was withheld.

On January 31, 2020, the BLM sent a second letter to RMI related to the 2018 Request, providing additional documents for review and requesting that if RMI "wish[es] to object to the release of this information," it should provide a statement justifying withholding any portion (D. 25 at ¶ 47). RMI never responded to the BLM's second letter (D. 25 at ¶ 48).

In response to the 2018 Request, the BLM withheld information under exemption 4 from a small number of documents that contained Pitkin Iron Corporation's (RMI's predecessor) bank account information (D. 25 at ¶ 49). The BLM withheld this financial information because it understood Pitkin kept its bank account number confidential, provided it to the BLM with an implied assurance of confidentiality, and Pitkin could be harmed if the public had access to its banking account and could interfere with its finances (D. 25 at ¶ 50).

On February 13, 2020, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested that if RMI "wish[es] to object to the release of this information," it should "provide a written statement setting forth the specific and detailed justification for withholding any portion" (D. 25 at ¶ 51). On March 13, 2020, the BLM sent a second letter to RMI providing additional documents the BLM had identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested again that if RMI "wish[es] to object to the release of this information," it should provide "a written statement explaining the justification for withholding any portion" (D. 25 at ¶ 52). On September 15, 2020, Ms. Garcia-Hinojosa emailed Robert Wagner from RMI regarding the BLM's March 2020 letter, writing "I believe you left me a voicemail in March stating that you did not see anything contained within the documents that would classify as a trade secret or as confidential. I am just verifying that this is correct" (D. 25 at ¶ 53). Mr. Wagner responded

that he "did not see anything contained within the documents that would classify as a trade secret or as confidential in that request" (D. 25 at ¶ 54).

On December 30, 2020, the BLM sent RMI a third letter attaching documents the BLM identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested that if RMI objects to the release, it should provide a statement justifying the withholding (D. 25 at ¶ 55). 56. On January 21, 2021, Ms. Garcia-Hinojosa emailed Mr. Wagner seeking a response to the December 30, 2020 letter (D. 25 at ¶ 56). RMI did not respond to the December 30, 2020, letter (D. 25 at ¶ 57).

As reflected in the *Vaughn* Index, in response to the 2019 Request, the BLM redacted confidential commercial and financial information from a small number of documents that included RMI's bank account numbers and URLs for its document sharing platform (D. 25 at ¶ 58).

RMI's private document sharing platform URLs are commercial in nature because RMI contracts for access to these sites and the documents it shares on these platforms relate to RMI's commercial functions (D. 25 at ¶ 59). The BLM withheld the URLs and banking information because RMI provided this information to the BLM with an implied assurance that it would be kept confidential, and the BLM understood this to be information RMI kept private (D. 25 at ¶ 60). The BLM understood that providing public access to RMI's bank account or its document sharing platforms could harm RMI because the public could interfere with RMI's banking or access confidential transaction-level data (D. 25 at ¶ 61).

On January 24, 2023, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2022 Request, but that RMI may consider confidential, and

requested that if RMI "wish[es] to object to the release of this information," it should provide a written statement justifying the withholding (D. 25 at ¶ 62).  On February 15, 2023, RMI responded to the BLM's letter asserting that the documents provided were confidential (D. 25 at ¶ 63).  Specifically, RMI asserted that the "Drill Hole Data, Map and Sampling Protocol," the scale tickets (sales reports) and escrow account calculations, and emails containing RMI's bank statements held commercial value, were not publicly available, and were provided to the BLM with an assurance that they would be kept confidential (D. 25 at ¶¶ 64, 65).  RMI provided its drill hole data, map, and sampling protocol to the BLM as a part of its expansion proposal and did so with the implied and explicit assurance from the BLM that this information would remain confidential (D. 25 at ¶ 66).  If RMI's drill hole data, map, and sampling protocol were released, it would harm RMI because its competitors would gain unfair insight into the geological formations within its mining claims and the quantity and type of reserves it possesses (D. 25 at ¶ 67).

### i.  FOIA Exemption 4

If the sales reports and escrow account data were disclosed, RMI would be harmed because competitors would know its customer-specific pricing and could negotiate lower prices to take business from RMI (D. 25 at ¶ 71).[8]  RMI also asserted that its banking information, such as its bank account numbers and transaction-level data, was confidential commercial information that it does not share publicly (D. 25 at ¶ 72).[9]  Disclosure of RMI's banking information would cause it

---

[8] Plaintiff does not explicitly dispute this fact or offer contrary evidence.  It is deemed admitted.

[9] Plaintiff does not explicitly dispute this fact or offer contrary evidence.  It is deemed admitted.

harm because the public could access its bank account and individual transaction data and, possibly, compromise its finances (D. 25 at ¶ 74).

Finally, RMI's dial-in line and the URLs for its file sharing platforms are confidential commercial information (D. 25 at ¶ 75). This information relates to RMI's running of its business and was shared with the BLM under the implied assurance of confidentiality (D. 25 at ¶ 76). Disclosure of RMI's telephonic or file sharing systems could compromise the security of such systems and provide the public access to confidential information that RMI shares through those channels (D. 25 at ¶ 77). Based on RMI's assertions of confidentiality, the nature of the information, and the BLM's assessment, the BLM withheld numerous documents in full or in part in response to the 2022 Request under exemption 4 (D. 25 at ¶ 78).

### ii. *FOIA Exemption 5*

The BLM withheld documents pursuant to exemption 5 that are pre-decisional and part of the BLM's deliberative process, reflect confidential attorney-client communications, are attorney work-product, or contain the government's confidential commercial information (D. 25 at ¶ 79).[10] A large number of documents were withheld in full or in part pursuant to the attorney-client privilege because the documents contained: (i) communications among BLM personnel, attorneys from the Solicitor's Office, and/or DOJ attorneys in the course of seeking or providing legal advice, or seeking or providing information necessary to provide legal advice; and (ii) documents reflecting Solicitor's Office and/or DOJ attorneys' legal advice in the form of comments or drafts

---

[10] In its Response, Plaintiff states that it "admits that paragraphs 79-92 state BLM's reasons for withholding the requested documents under Exemption 5." This argument is improperly placed and does not respond to the stated facts or provide contrary evidence. Notably, Plaintiff does not assert that any of the asserted facts are actually legal conclusions or deny them. Accordingly, these facts are deemed admitted.

(D. 25 at ¶ 80). If disclosed, the redacted information would reveal confidential, attorney-client privileged material (D. 25 at ¶ 81).

Additionally, as indicated in the attached *Vaughn* Index, a small number of documents were withheld in full or in part pursuant to work product protection because they were draft legal documents, or communications relating to draft briefs, declarations and other filings that were prepared by attorneys in the context of ongoing or foreseeable litigation under the APA and/or FOIA (D. 25 at ¶ 82). If disclosed, the redacted material would reveal attorney mental impressions and work product (D. 25 at ¶ 83). The BLM also redacted agency conference line numbers, passcodes and URLs for document sharing platforms that were shared internally for the purpose of conducting official government business (D. 25 at ¶ 84). These numbers relate solely to internal agency practices and are of little to no public interest (D. 25 at ¶ 85). Disclosure of this information could allow individuals outside the agency to dial into the agency's telephone conference system or obtain unauthorized access to agency information and disrupt agency operations (D. 25 at ¶ 86).

Pursuant to the deliberative process privilege, the BLM withheld drafts or internal documents and communications among BLM officials discussing and providing opinions related to (1) the escrow account agreement with RMI, (2) the BLM's response to RMI's proposed expansion of the Mine, which the BLM is still evaluating, (3) non-compliance issues at the Mine, and (4) agency actions under consideration by federal officials that are unrelated to the Mine (D. 25 at ¶ 87). The draft documents and email discussions were circulated confidentially among relevant federal officials, and the draft versions and email discussions would not be made public in the normal course of business (D. 25 at ¶ 88). Draft documents generally incorporate BLM officials' proposed changes, questions, comments, and/or areas of concern or interest regarding

the pre-decisional documents—as these draft documents did (D. 25 at ¶ 89).   The factual

information withheld in the documents consists of facts selectively chosen by federal officials for

inclusion in the pre-decisional draft documents or discussions (D. 25 at ¶ 90). Disclosure of these

documents would reveal part of the BLM's deliberative process; in particular, which facts the

officials believed important to include (D. 25 at ¶ 91).   Furthermore, disclosure of these documents

would discourage candid discussions within the BLM (D. 25 at ¶ 92).

## II.  LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The Court must consider the factual record and reasonable inferences based on said record

"in the light most favorable to the non-moving party." *Utah Lighthouse Ministry v. Found. for*

*Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).  The moving party bears the

burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323–24 (1986).  A genuine issue of material fact exists if a reasonable jury could

return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Id.*  If the moving party meets this

burden, the opposing party must go beyond the pleadings and designate evidence showing there is

a genuine triable issue. *Celotex*, 477 U.S. at 323–24.  Ultimately, the Court's inquiry on summary

judgment is whether the facts and evidence identified by the parties present "a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980). Cross-motions for summary judgment must be viewed separately, and the denial of one does not necessitate the granting of the other. *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (citations omitted).

### B. The FOIA

The FOIA provides in general that the public has a right of access to federal agency records, and the right is enforceable in court. *Anderson v. Dep't of Health and Human Servs.*, 907 F.2d 936, 941 (10th Cir. 1990); *Stewart v. United States Dep't of Interior*, 554 F.3d 1236, 1239 (10th Cir. 2009); 5 U.S.C. § 552(b). The FOIA governs requests made for the records of a federal agency. *See Trentadue v. F.B.I.*, 572 F.3d 794, 796 (10th Cir. 2009). The right to federal agency records is "subject to nine specific exemptions." *Anderson*, 907 F.2d at 941; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011) (FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material."). It provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). A district court in any FOIA action challenging an agency decision to withhold records reviews the agency's decision not to disclose de novo, *Herrick v. Garvey*, 298 F.3d 1184, 1189 (10th Cir. 2002), reading the act broadly in favor of disclosure and construing its exemptions narrowly. *Hull v. I.R.S.* 656 F.3d 1174, 1177 (10th Cir. 2011); *Anderson*, 907 F.2d at 941.

"In general, FOIA request cases are resolved on summary judgment." *See World Publishing Co. v. U.S. Dep't of Justice*, 672 F.3d 825, 832 (10th Cir. 2012). Courts may award summary judgment in FOIA cases based solely upon the information provided in affidavits or declarations. *Id.* (observing that a court may grant summary judgment based on declarations); *Hull*, 656 F.3d at 1178 ("To satisfy its burden of proof under FOIA, an agency typically submits affidavits."). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (cited by the Tenth Circuit with approval in *Trentadue*, 572 F.3d at 808). When considering motions for summary judgment in the FOIA context, "if a review of the record raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials, summary judgment is inappropriate." *Valencia-Lucena v. United States Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999). If the affidavits "provide specific information sufficient to place the documents within the exemption 5 category, if the information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate." *Hull*, 656 F.3d at 1177–78.

## III. ANALYSIS

### A. Admissibility of Defendant's Evidence

Plaintiff challenges one portion of the Garcia-Hinojosa declaration as hearsay (D. 26 at 37). It argues that "BLM provides no admissible evidence for BLM's conclusory explanation that hearsay conveyed by the Garcia-Hinojosa declaration 'would tend to indicate' that headquarters personnel were not 'substantially involved in the matter'" (*id.*). This argument is unavailing.

As Defendants argue in reply, an "affidavit from an agency employee responsible for supervising a FOIA search is all that is needed . . .; there is no need for the agency to supply affidavits from each individual who participated in the actual search." *Akel v. Dep't of Just.*, 578 F. Supp. 3d 88, 100 (D.D.C. 2021) (cleaned up). "[S]o long as the declarant attests to his personal knowledge of the procedures used in handling the request and his familiarity with the documents in question, he satisfies Rule 56's personal knowledge requirement." *Id*. (cleaned up). "Because courts routinely allow declarations from agency employees not directly involved in a search for records, hearsay is generally permitted." *Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Mgmt.*, 455 F. Supp. 3d 1005, 1020 n.3 (D. Colo. 2020) (citation omitted); *see also Ecological Rts. Found. v. U.S. Env't Prot. Agency*, 541 F. Supp. 3d 34, 50 (D.D.C. 2021) ("statements by agency declarants who are knowledgeable insiders as to the agency practices and procedures on which they testify and who acquire knowledge from examination of agency records constituting public records and reports are admissible") (citation omitted).

**B. Reasonableness of Search**

Plaintiff argues that Defendants failed to conduct a reasonable search of their records (D. 26 at 35–36). Plaintiff asserts that it was unreasonable for Defendants not to search the "Washington, DC offices of the BLM and Interior Department" because the "BLM/DOI headquarters offices were directly involved in critical decision-making on the Mine" (*id*. at 36).

Defendants assert that, notwithstanding their decision not to search their Washington, D.C. offices, the search that they conducted was nonetheless reasonable (D. 30 at 26). The Court agrees.

"Reasonableness does not require defendant to search every record system or to demonstrate that no other potentially responsive documents might exist, but it must show 'that it

made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Rocky Mountain Wild, Inc. v. United States Forest Serv.*, 138 F. Supp. 3d 1216, 1221 (D. Colo. 2015) (quoting *Oglesby v. United States Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). "Courts 'evaluate the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception.'" *Id.* at 1222 (quoting *Friends of Blackwater v. U.S. Dep't of Interior*, 391 F. Supp. 2d 115, 121 (D.D.C. 2005)).

Based on her review, Ms. Garcia-Hinojosa determined, after "consultation with the Mine subject matter experts" and "other employees within the BLM," not to search other offices. This determination is reasonable "because, with few exceptions, mining decisions are made at the state level" and that "communications with other offices, including Washington D.C., would have been between that office and the Colorado State Office" such that they "would have been captured by the searches conducted by the Colorado State Office custodians" (D. 25-1 at 23). The decision not to search further offices was made at the conclusion of the review of documents and, accordingly, took into consideration what those documents contained (D. 25 at ¶ 21). The records already located "did not contain records or communications which would tend to indicate that a non-Colorado BLM official was substantially involved in matter" (D. 25-1 at 22–23). Plaintiff's speculation that other documents may exist, even if true, does not render the search unreasonable or call into question the determination that searches of headquarters records "were not reasonably likely to contain unique documents not already captured by the searches the already-identified custodians had performed" (D. 25 at ¶ 21). Even if the headquarters did have other responsive records, there is no reason to believe that such documents would be subject to production because,

25

as discussed below, pre-decisional records are not available under FOIA and decisions, in this

circumstance, are generally made at the state level.

### C. Applicability of Exemptions

Plaintiff has withdrawn its objections regarding the documents withheld under exemptions

3 and 6 (D. 26 at 34).   Thus, only withholdings under exemptions 4 and 5 are at issue.   These

exemptions apply to matters that are:

> (4) trade secrets and commercial or financial information obtained
> from a person and privileged or confidential;
>
> (5) inter-agency or intra-agency memorandums or letters that would
> not be available by law to a party other than an agency in litigation
> with the agency, provided that the deliberative process privilege
> shall not apply to records created 25 years or more before the date
> on which the records were requested;

5 U.S.C. § 552(b).

### 1. Exemption 4

Plaintiff argues that Defendants "failed to prove that the withheld sales reports and Escrow

information satisfied the heavy burden of confidentiality" (D. 26 at 28).[11]   It asserts that, because

Defendants previously produced sales reports without asserting confidentiality, the later reports

and related Escrow information are not confidential (*id*. at 30–31).

---

[11] Plaintiff also argues that the procedures used are at odds with BLM regulations because RMI did not designate the documents as confidential quickly enough and did not mark every page (D. 26 at 28–29).   But it does not argue, and cites no authority for the proposition, that these provisions prevent BLM from withholding under FOIA exemptions notwithstanding third-party delays in the designation of records as confidential (*id*.).   Rather the BLM "encourages, but does not require, submitters to designate confidential information . . . at the time of submission or reasonably soon thereafter."   Accordingly, the Court focuses on whether the documents are confidential within the meaning of FOIA. Plaintiff further argues that showing harm to RMI's competitive position from disclosure is insufficient, and BLM must instead show that disclosure would harm BLM's ability to regulate the Mine (*id*. at 32).   The Court does not reach this issue because the records are confidential under the general test.

"To receive protection under Exemption 4, information, if not a trade secret, must be: (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1270–71 (10th Cir. 2021) (internal quotations omitted). Only the third element, confidentiality, is at issue.  Information is "confidential" at least[12] when the "information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

Defendants rely on the Declaration of Robert Wagner, a Vice President of Engineering at RMI (D. 25-4 at 3).  He avers that:

> 42. The [sales reports] and escrow account calculation files contain specific information about the types of products RMI sells, the exact prices RMI sells them for, and the specific customers RMI is selling them to.

> 43. The pricing we provide to different customers in the market varies based on the job and our relationship with them.

> 44. While we do publish a general pricing list for the public, we do not let the public know what we are charging each specific customer for each product.

> 45. RMI takes every reasonable precaution to protect its customer list, customer-specific pricing, and purchase information from the public and its competitors.  In most cases, this information remains within RMI's secure computer systems and is not publicly available, other than via the submission of this information to BLM or other governmental agencies. RMI employees and authorized agents are directed to keep its customer list, customer-specific pricing, and purchase information, confidential.

> 46. We provided the [sales reports] and escrow account calculations to the BLM because it was required under the Escrow Agreement.

---

[12] The Supreme Court declined to determine whether the second prong, i.e., that a record was provided under an assurance of privacy, was mandatory.  *Argus Leader Media*, 588 U.S. at 435.

> We provided this information under both an implied and express assurance that the information would remain confidential. Specifically, RMI submitted this information to the BLM under its regulations at 42 C.F.R. § 3600. Those regulations provided RMI an express assurance that if RMI asserted the information is confidential, the "BLM will keep all data and information confidential to the extent allowed by [the Department's FOIA regulations]." 43 C.F.R. § 3601.8.

(D. 24-5 at 13–14) (footnote omitted).

The Court finds this evidence sufficient to meet both prongs of the confidentiality test. It shows that RMI customarily and actually treated the information contained in the sales reports and related escrow information as private. It also shows that it had an assurance of privacy in the materials.[13] As various Courts have concluded, that BLM previously produced such reports when RMI did not indicate that they were confidential does not prevent later documents of the same type from being confidential when they meet the applicable standard. *Friends of Animals*, 15 F.4th at 1264 ("Past disclosures are not determinative.") (citing *Mobil Oil Corp. v. E.P.A.*, 879 F.2d 698, 701 (9th Cir. 1989)); *Wolf v. C.I.A.*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure.").

### 2. Exemption 5

Plaintiff argues that the limited information in the *Vaughn* Index "provides insufficient basis to analyze the assertion of privilege and the propriety of the withholding" under exemption 5 (D. 26 at 33). It notes that "index entries, claiming exemption 5 attorney-client or attorney work

---

[13] Plaintiff argues that the cited regulation cannot apply because, despite common variety mineral material mining being at issue and what is described in the sales reports, the Mine had been incorrectly regulated under a different regime (D. 26 at 29). However, the cited regulation, 42 C.F.R. § 3600, applied to the mining occurring and the related reports and, this regulation provided a basis for RMI to believe the submissions would be treated as confidential if RMI asserted confidentiality, which is what ultimately matters. *See Argus Leader Media*, 588 U.S. at 435.

product privileges, do not list the both the author and recipient, making it impossible to gauge the veracity of the claimed privilege" (*id*.). It requests *in camera* review (*id*. at 34).

The Court denies the request to review the documents. Exemption 5 "protects documents that would be covered by any privilege that an agency could assert in a civil proceeding," including protections of confidential attorney-client communications and attorney work-product. *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007). The undisputed facts show that "BLM withheld documents pursuant to exemption 5 that are pre-decisional and part of the BLM's deliberative process, reflect confidential attorney-client communications, are attorney work-product, or contain the government's confidential commercial information" (D. 25 at ¶ 79). Where documents have been redacted, the undisputed facts show that, "[i]f disclosed, the redacted information would reveal confidential, attorney-client privileged material" (D. 25 at ¶ 81). Thus, *in camera* review is unnecessary.

### D. Reasonably Segregable Portions of Records

Specific to the sales reports, Plaintiff argues that Defendants failed to comply with their obligations "under FOIA to redact only those specific portions of the document(s) that are legally exempt" (D. 26 at 35). *See* 5 U.S.C. § 552 ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). It asserts that, even if the customer-specific pricing information is confidential, the "the type of material actually sold, such as rip-rap, roadbase, and other forms of rock, as well as its purchasers (such as County/City road projects and local construction firms acknowledged by RMI and BLM) have not been claimed as confidential" (D. 26 at 35). Plaintiff

asserts that "RMI publicly stated and advertised it was selling these products, and to whom" (*id*.) (citing D. 26-1 at 29–53).

Defendants counter that "the information in the escrow account documents is not publicly available and is not reasonably segregable from the confidential information" and that "RMI's customers and the exact products they purchase *is* confidential" (D. 30 at 38).

Rather than stating RMI's specific customers and what they purchased, the 24 undifferentiated pages cited by Plaintiff generally indicate its class of customers and total sales. For example, RMI's March 31, 2023 Form 10-K indicates that it "serves Arch Resources, local construction firms, and various city and county government construction" and that the Mine "produced and sold 21,578 and 26,356 tons of high-calcium limestone" in the fiscal year (D. 26-1 at 52). The Declaration of Robert Wagner indicates that the specifics of who customers are what customers buy is maintained as confidential, i.e., RMI's "customer list, customer-specific pricing, and purchase information" (D. 24-5 at 13). Thus, the Court finds this information was properly withheld under exemption 4 for the reasons stated above and need not have been segregated. Because Defendants have shown that they have complied with FOIA, the Court grants Defendants' motion and denies Plaintiff's motion as moot.

## IV. CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (D. 25) is GRANTED and Plaintiff's Cross Motion for Summary Judgment (D. 27) is DENIED AS MOOT. It is FURTHER ORDERED that JUDGMENT shall enter in favor of Defendants and against Plaintiff.

DATED July 28, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge